**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

American Chemical Society
1155 Sixteenth Street, N.W.
Washington, D.C.  20036,

     Plaintiff,

v.

JOHN DOEs 1-99,

     Defendants.

Civil Action No. _____

## VERIFIED COMPLAINT

Plaintiff American Chemical Society ("ACS"), by counsel, alleges as follows for its

Verified Complaint against the Defendant John Does 1-99.

## NATURE OF THE SUIT

1.    This is an action against the Defendant John Does for direct and contributory

copyright infringement under the Copyright Act, 17 U.S.C. § 101, trademark counterfeiting and

infringement under the Lanham Act, 15 U.S.C. § 1114(1), and conversion under Virginia law.

2.    Since 1876, the global scientific community has relied on ACS to provide

scientific services and information of exacting quality.  With nearly 157,000 members, ACS is

the world's largest scientific society and one of the world's leading sources of authoritative

scientific information.

3.    A nonprofit organization chartered by Congress, ACS is at the forefront of the

evolving worldwide chemistry enterprise and the premier professional home for chemists,

chemical engineers and related professions.  Among its many charitable activities, ACS

publishes scientific journals, magazines, books and databases, convenes major research

conferences and provides educational, science policy and career programs in chemistry. Another ACS program is the ACS Scholars Program, which provides underrepresented minority undergraduates with scholarship and mentoring support to earn degrees in the chemical sciences. Project SEED offers bright, economically disadvantaged high school students an opportunity to spend a summer conducting chemical laboratory research with the guidance of a chemical scientist. ACS also supports the professional development of science teachers so they can better present chemistry in the classroom and foster the scientific curiosity of our nation's youth. ACS awards more than $20 million every year in grants for basic research. ACS plays a leadership role in educating and communicating with public policy makers and the general public about the importance of chemistry in our lives, by, among other things, identifying new solutions, improving public health, protecting the environment, and contributing to the economy.

4.      Plaintiff's invaluable copyrights have been deliberately infringed by John Does 1-99, who have stolen Plaintiff's copyright-protected scientific articles and reproduced and distributed them on the Internet without permission.   Specifically, Defendants created and operate two websites located at http://pubs.acs.org.sci-hub.cc and http://acs.org.secure.sci-hub.cc (collectively, "the Pirated/Spoofed Site") which are nearly identical to ACS's website in form and content, including hosting and providing copies of hundreds of thousands of copyright-protected scientific journals that are owned by ACS, as well as replicating ACS's registered trademarks.

**PARTIES**

5.      Founded over 140 years ago, Plaintiff ACS was chartered by Congress as a federal corporation in 1938.   In designating ACS as a federal corporation, Congress provided, "That the objects of the incorporation shall be to encourage . . . by its meetings, professional

contacts, reports, papers, discussions, and publications, to promote scientific interests and inquiry, thereby fostering public welfare and education, aiding the development of our country's industries, and adding to the material prosperity and happiness of our people."

6.     The Internal Revenue Service has recognized ACS as a charitable organization under Section 501(c)(3), and its predecessors of the Internal Revenue Code, since at least 1926.

7.     ACS is headquartered at 1155 Sixteenth Street, N.W., Washington, D.C. 20036. ACS has over 150 local chapters throughout the United States and nearly 157,000 members, including over 27,000 internationally-based members representing more than 135 countries.

8.     Defendants John Doe 1-99, operating under the name "Sci-Hub," are persons of unknown identity who have stolen ACS's copyright-protected scientific articles and other materials and reproduced them without permission on the Pirated/Spoofed Site.

9.     According to records in the WHOIS database of domain name registrations, the sci-hub.cc domain name being used by Defendants to operate the Pirated/Spoofed Site was registered on June 26, 2015, to Zhuhai Yingxun Keji Limited under the contact email address "service@todaynic.com."   A copy of the domain name registration record for the Pirated/Spoofed Site is attached as Exhibit A.

10.     On the webpage sci-hub.cc, Defendants provide links to their social media accounts, including Facebook (facebook.com/sci.hub.org) and Twitter (@Sci_Hub).  The Twitter account states: "Open access to scientific literature.  Knowledge-everything!  Breaking through academic paywalls since 2011."  See Exhibit B.

11.     Defendants also claim on social media that the purpose of Sci-Hub is to provide "free access to scientific literature.  Now the spread of the literature on the internet is artificially limited to copyright laws designed to protect 'intellectual property.'   We are in favor of the

abolition of property . . . .  Now the project Library at sci-hub.cc . . . hosts more than 58 million

peer-reviewed scientific articles for free download."  *See* Exhibit C.

12.     Defendants' webpage at vk.com/sci_hub lists a contact email address of

"admin@sci-hub.io."  *See* Exhibit D.

## JURISDICTION, VENUE AND JOINDER

13.     This is a civil action for direct and contributory copyright infringement under the

Copyright Act, 17 U.S.C. § 101, for trademark counterfeiting and infringement under the

Lanham Act, 15 U.S.C. § 1114(1), and conversion under Virginia law.

14.     This Court has original jurisdiction under 28 U.S.C. § 1331 (federal question

jurisdiction); 28 U.S.C. § 1338(a) (any act of Congress relating to patents, copyrights, and

trademarks); and 28 U.S.C. § 1367 (supplemental jurisdiction).

15.     ACS's claims against Defendants are based on Defendants' operation of the

Pirated/Spoofed Site, including misuse of ACS trademarks and the reproduction and display of

ACS's copyright protected scientific articles.  The Pirated/Spoofed Site reproduces nearly the

entire contents of Plaintiff's legitimate website, acs.org, which is hosted on servers controlled by

ACS in Ashburn, Virginia and Vienna, Virginia.

16.     Defendants directed the acts complained of herein toward this district and utilized

instrumentalities in this district in that Defendants appear to have gained unauthorized access to

ACS's password-protected website maintained in this district so as to copy and distribute ACS's

intellectual property through the Pirated/Spoofed Site that operates on a domain name that is also

maintained in this district.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events giving rise to the claims occurred in this district and the .cc domain

name registry operator, VeriSign Inc., is located in this district.

18.     Joinder of Defendants John Does 1-99 is proper under Fed. R. Civ. P. 20(a)(2) in that the claims set forth herein arise out of the same series of transactions and the same questions of law are common to all Defendants.

## ACS'S INTELLECTUAL PROPERTY RIGHTS

19.     ACS began publication of articles reporting on chemical research with the Journal of the American Chemical Society in 1879. Today, ACS publishes over 50 peer-reviewed journals with cutting-edge articles across a broad spectrum of scientific disciplines.

20.     The quality, breadth and scope of ACS's journals are unparalleled, stretching across chemistry, physics, and biology. Every year, over 100,000 authors and their research teams from the community of scientists worldwide submit their work for consideration in these journals. Last year, ACS published more than 40,000 of the most significant submissions.

21.     In addition, ACS publishes an array of eBooks. Spanning the gap between discoveries published in patents and journals, the peer-reviewed eBooks of ACS contain essential research conducted by the world's leading scientists across all disciplines and applications. The ACS eBooks, which consist of the Advances in Chemistry series and the ACS Symposium Series, now include more than 1,400 eBooks developed from ACS-sponsored symposia and written by chemistry's brightest minds. Approximately 30 new ACS eBooks are published each year.

22.     As one of the first publishers to provide online editions of its journal content, ACS has always been at the forefront in the publication of peer-reviewed scientific articles. Today, virtually all of ACS publications are disseminated digitally via electronic licenses over the internet.  ACS journals and eBooks reside on the publications platform of the ACS website,

acs.org.  Last year, some 27 million unique visitors came to the publications platform, performed 51 million searches, and made 94 million separate article requests.

23.     Noted for their high quality, rapid time to publication, as well as seminal and prevalent citation in future research, ACS journals and eBooks are accessible to authorized users/viewers electronically at more than 5,000 academic, business, and corporate institutions worldwide. In addition, the Society's nearly 157,000 members have specified electronic access to articles from ACS journals and eBooks as a benefit of membership.

24.     In short, ACS provides the global scientific community with cutting-edge research from some of the most trusted and most cited, peer-reviewed publications in the chemical and related sciences.

25.     ACS's aforementioned publications contain creative material wholly original to ACS and include substantial copyrightable subject matter under the copyright laws of the United States

26.     ACS's Bylaws provide: "For any writing of an author published by the SOCIETY in any of its books, journals, or other publications, the SOCIETY shall own the copyright for the original term and any renewal thereof except (1) in the case of a work prepard by an officer or employee of the United States Government as part of that person's official duties, or (2) in the case of a work prepared solely by employee(s) of a foreign country's government, or entity thereof, which reserves copyright as directed by the laws of that country, or (3) in those instances in which the SOCIETY's Executive Director deems the owning or acquisition of copyright in a given work to be impractical or impossible."  Accordingly, ACS staff take active steps to register the copyrights of each of its copyright-able materials.  For instance, in 2015, the last full year for which information is available, ACS registered 960 issues of its journals.  The U.S. Copyright

Office database reports that ACS publications are covered by over 9,000 copyright registrations issued by the U.S. Copyright Office (collectively "ACS's Copyrighted Works"). A schedule identifying certain of the copyright registrations for ACS's Copyrighted Works is attached hereto as Exhibit E.

27.     At all times relevant hereto, ACS has been and still is the owner and proprietor of all right, title, and interest in and to ACS's Copyrighted Works.

28.     ACS promotes and provides its publications to consumers through use of distinctive trademark titles that have been registered with the U.S. Patent and Trademark Office (collectively the "ACS Marks"). The ACS marks are *conclusive* or *prima facie* evidence of the validity of the marks and of ACS's exclusive right to use the marks in association with the registered goods/services throughout the United States.

29.     A schedule identifying certain of the trademark registrations for the ACS Marks is attached hereto as Exhibit F, and true and correct copies of the referenced U.S. trademark registrations for the ACS Marks are attached hereto as Exhibit G.

## DEFENDANTS' UNLAWFUL ACTIVITIES

30.     Defendants claim that Sci-Hub "provides free access to scientific literature. Now the spread of the literature on the internet is artificially limited to copyright laws designed to protect 'intellectual property.' We are in favor of the abolition of property. . . . Now the project Library at sci-hub.cc . . . hosts more than 58 million peer-reviewed scientific articles for free download." See Exhibit C.

31.     Defendants publish a website at sci-hub.cc to describe the purported purpose and function of Sci-Hub, claiming that Sci-Hub is "the first pirate website in the world to provide mass and public access to tens of millions of research papers." The following is a screenshot

capture of the Sci-Hub home page on sci-hub.cc:



32.     The Sci-Hub homepage further claims that, "At this time, the widest possible distribution of research papers, as well as other scientific or educational sources, is artificially limited by copyright laws."  The Sci-Hub homepage offers Sci-Hub's "ideas" on copyright law. Under the heading "no copyright," the page states, "We advocate for the cancellation of intellectual property, or copyright laws, for scientific and educational resources.  Copyright laws render the operation of most online libraries illegal. . . We advocate for the cancellation of intellectual property, or copyright laws."

33.     The Sci-Hub page requests donations, in the form of Bitcoin, to support Sci-Hub, stating, "Make your contribution to the battle against copyright laws and information inequality." The following screen capture shows the link for donations to Sci-Hub on sci-hub.cc:



34.    Defendants registered the domain name sci-hub.cc and, within that domain, Defendants created the Pirated/Spoofed Site at the sub-domains pubs.acs.org.sci-hub.cc and acs.org.secure.sci-hub.cc.

35.    The .cc top-level domain registry is promoted, operated and managed in the district by VeriSign, Inc.

36.    Upon information and belief, the sub-domains pubs.acs.org.sci-hub.cc and acs.org.secure.sci-hub.cc were created by Defendants to imitate ACS's legitimate website through use of ACS's "ACS" trademark and legitimate domain name acs.org within the sub-domains.

37.    The Pirated/Spoofed Site that Defendants are making available at pubs.acs.org.sci-hub.cc and acs.org.secure.sci-hub.cc is nearly identical to Plaintiff's website,

located at acs.org.   For example, following is a screen capture of the home page of Plaintiff's legitimate website:



38.    For comparison, following is a screen capture of the home page of the Pirated/Spoofed Site:



39.     The Pirated/Spoofed Site appears to almost completely replicate the content of Plaintiff's website.   For example, the Pirated/Spoofed Site replicates webpages on ACS's history, purpose, news, scholarship opportunities, and budget, *see* Exhibit H.   Each of these pages on the Pirated/Spoofed Site contains ACS's Copyrighted Works and the ACS Marks, creating the impression that the Pirated/Spoofed Site is associated with ACS.

40.     The Pirated/Spoofed Site also replicates ACS's searchable database of copyright protected scientific journals.   The following screen capture screen shows the publications page of Plaintiff's legitimate website:



41.     The following screen capture of the Pirated/Spoofed Site replicates the publications page of Plaintiff's legitimate website and allows for a user to search for ACS's Copyrighted Works by search terms:



42.     The Pirated/Spoofed Site also replicates Plaintiff's website by allowing access to ACS unauthorized copies of ACS's Copyrighted Works by searching by topic.   The following screen capture of the Pirated/Spoofed Site shows the ability to search and view ACS's Copyrighted Works by topic:



43.     Unauthorized copies of all, or substantially all, of ACS's Copyrighted Works are being distributed by Defendants at the Pirated/Spoofed Site for free download.

44.     The Pirated/Spoofed Site also repeatedly uses the ACS Marks without authorization.

45.     Defendants are attempting to divert users and revenues away from ACS by replicating and distributing ACS's Copyrighted Works without authorization.

46.     The Pirated/Spoofed Site includes repeated links for donations to Sci-Hub to support Defendants' continued infringement of Plaintiff's copyrights and trademarks.   For example, when a user clicks on a copyright protected scientific article on the Pirated/Spoofed Site, the user is often given the option to donate to Sci-Hub.  The donations page states, "Do you like Sci-Hub?  If yes, consider donating . . . Since the project started in 2011, we have distributed tens of millions of research papers for free."   The donations page on the Pirated/Spoofed Site contains a link for a Bitcoin wallet.



47.     The Bitcoin wallet is the same as the Bitcoin wallet on the sci-hub.cc website discussed in Paragraph 33.

## COUNT ONE:
### (Copyright Infringement)

48.     ACS repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

49.     Defendants have infringed and continue to infringe ACS's copyrights in ACS's Copyrighted Works by copying, distributing, altering, and/or displaying the works.

50.     Such copying, distributing, altering, and/or displaying of ACS's Copyrighted Works was done by Defendants without the consent, approval, or license of ACS.

51.     The foregoing actions of Defendants have been knowing, deliberate, willful, and in utter disregard of ACS's rights.

52.     The above acts by Defendants violate ACS's exclusive rights under § 106 of the Copyright Act, 17 U.S.C. § 106, and constitute willful infringement of ACS's copyrights under § 501 of the Copyright Act, 17 U.S.C. § 501.

53.     Defendants' conduct has caused and is causing immediate and irreparable injury to ACS and will continue to damage ACS unless enjoined by this Court.  ACS has no adequate remedy at law.

## COUNT TWO:
### (Contributory Copyright Infringement)

54.     ACS repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

55.     Visitors to the Pirated/Spoofed Site are engaged in direct copyright infringement through the unauthorized downloading, viewing, publicly displaying, copying and/or distributing

ACS's Copyrighted Works.

56.    Defendants' aforementioned actions constitute intentional inducement, encouragement, and/or material contribution to direct copyright infringement by such visitors to the Pirated/Spoofed Site.

57.    The foregoing actions of Defendants have been knowing, deliberate, willful, and in utter disregard of ACS's rights.

58.    The above acts by Defendants violate ACS's exclusive rights under § 106 of the Copyright Act, 17 U.S.C. § 106, and constitute secondary/contributory infringement of ACS's copyrights under § 501 of the Copyright Act, 17 U.S.C. § 501.

59.    Defendants' conduct has caused and is causing immediate and irreparable injury to ACS and will continue to damage ACS unless enjoined by this Court.  ACS has no adequate remedy at law.

### COUNT THREE:
### (Trademark Counterfeiting)

60.    ACS repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

61.    Defendants are intentionally and knowingly using the ACS Marks in connection with the distribution of unauthorized versions of ACS's copyright protected scientific articles and third-party publications that do not originate from ACS.

62.    Defendants have used the ACS Marks on the Pirated/Spoofed Site in association with goods covered by ACS's federal registrations for such marks.

63.    Defendants have used the ACS Marks without authorization in connection with the advertisement, promotion, and/or distribution of goods that do not originate from ACS and/or which are not authorized by ACS.

64.     Defendants' unauthorized use of the ACS Marks on and in connection with advertisement, promotion, and/or distribution of goods constitutes use of the ACS Marks in commerce and Defendants are profiting from such unauthorized use of the ACS Marks.

65.     Defendants' unauthorized use of the ACS Marks as set forth above is likely to: (a) cause confusion, mistake and deception; (b) cause the public to believe that the Defendants' distribution of the ACS scientific articles and/or third-party publications is authorized, sponsored or approved by ACS or that Defendants are affiliated, connected or associated with or in some way related to ACS; and (c) result in Defendants unfairly benefiting from ACS's advertising and promotion and profiting from the reputation of ACS and the ACS Marks all to the substantial and irreparable injury of the public and ACS.

66.     Defendants' aforesaid acts constitute willful trademark counterfeiting in violation of Sections 32 and 34 of the Lanham Act, 15 U.S.C. § 1114 and 1116(d)(1).

67.     The aforesaid acts have caused, and are causing, great and irreparable harm to ACS and the public.  The harm to ACS includes harm to the value and goodwill associated with the ACS Marks that money cannot compensate.  Unless permanently restrained and enjoined by this Court, said irreparable harm will continue.

**COUNT FOUR:**
**(Trademark Infringement)**

68.     ACS repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

69.     Defendants are using the ACS Marks in commerce and have no valid rights in the ACS Marks.

70.     Defendants have actual and/or constructive notice, pursuant to Section 22 of the Lanham Act, 15 U.S.C. § 1072, of the existence of ACS's superior rights in its ACS Marks by

reason of the existence of ACS's aforestated federal trademark rights.

71.    Use of the ACS Marks by Defendants is without the permission or authorization of ACS.

72.    The aforesaid acts by Defendants have caused and/or are likely to cause confusion, mistake and/or deception among consumers and the public, leading the public falsely to believe that the scientific articles advertised and distributed by Defendants are those of, are sponsored or approved by, or are in some way connected with ACS.

73.    The aforesaid acts by Defendants constitute direct infringement of ACS's trademark rights in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114.

74.    The aforesaid acts have caused, and are causing, great and irreparable harm to ACS and the public.  The harm to ACS includes harm to the value and goodwill associated with the ACS Marks that money cannot compensate.  Unless permanently restrained and enjoined by this Court, said irreparable harm will continue.

## COUNT FIVE:
### (Conversion)

75.    ACS repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

76.    ACS is the owner of property rights in and to ACS's publications including ACS's Copyrighted Works.

77.    Defendants have wrongfully taken control of ACS's publications.

78.    Defendants' wrongful exercise of dominion and control over ACS's publications deprives ACS of the exclusive use and control of ACS's publications in violation of ACS's rights in and to the publications.

79.    To the extent that Defendants have subsequently transferred ACS's publications

to a person or persons other than Defendants, such other person's wrongful exercise of dominion and control over ACS's publications deprives ACS of exclusive use and control of ACS's publications in violation of ACS's rights in and to the publications.

80.     ACS has suffered damages including the loss of exclusive dominion and control over ACS's publications as a result of the conduct complained of herein and is entitled to injunctive relief, actual, statutory, and/or punitive damages, and/or attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, ACS respectfully requests of this Court:

1.     That judgment be entered in favor of ACS on its claims of copyright infringement and trademark counterfeiting and infringement.

2.     That the Court preliminarily and permanently enjoin Defendants, their officers, directors, principals, agents, servants, employees, successors and assigns, and all those in active concert or participation with them, jointly and severally, from:

a.     Copying, distributing, altering, displaying, hosting, selling and/or promoting ACS's Copyrighted Works;

b.     Using any copy or colorable imitation of the ACS Marks in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, printing, importation, production, circulation, or distribution of any product or service, in such fashion as to relate or connect such product in any way to ACS, or to any goods sold, manufactured, sponsored, approved by, or connected with ACS; and

c.     Engaging in any other activity constituting unfair competition with ACS, or constituting an infringement of the ACS Marks or ACS's Copyrighted Works, or constituting any damage to ACS's name, reputation, or goodwill.

3.      That those in privity with Defendants and those with notice of the injunction, including any Internet search engines, web hosting and Internet service providers, domain name registrars, and domain name registries, cease facilitating access to any or all domain names and websites through which Defendants engage in unlawful access to, use, reproduction, and distribution of the ACS Marks or ACS's Copyrighted Works;

4.      That the domain name registries for Defendants' domain names and websites, or their administrators, place the domain names on registryHold/serverHold or such other status to render the names/sites non-resolving;

5.      That Defendants are required to pay ACS actual, compensatory and/or statutory damages pursuant to 15 U.S.C. § 1117(c) and 17 U.S.C. § 504(c);

6.      That Defendants are required to disgorge all revenues and/or donations received from the distribution of ACS's copyright protected scientific articles;

7.      That the Court order an award of costs and reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(a), 17 U.S.C. § 505, or as otherwise permitted by law, incurred by ACS in connection with this action;

8.      That ACS be awarded pre-judgment interest and post-judgment interest on the above damages awards; and

9.      That the Court order an award to ACS of such other and further relief as the Court may deem just and proper.

Dated: June 23, 2017          By:     /s/ Attison L. Barnes. III /s/
                                      Attison L. Barnes, III (VA Bar No. 30458)
                                      David E. Weslow (for *pro hac vice)*
                                      Matthew J. Gardner (for *pro hac vice)*
                                      WILEY REIN LLP
                                      1776 K St. NW
                                      Washington, DC 20006
                                      (202) 719-7000 (phone)
                                      abarnes@wileyrein.com
                                      dweslow@wileyrein.com
                                      mgardner@wileyrein.com

                                      *Counsel for Plaintiff*
                                      *American Chemical Society*

## **VERIFICATION**

I, David T. Smorodin, Assistant General Counsel of the American Chemical Society,

declare under penalty of perjury under the laws of the United States of America, pursuant to 28

U.S.C. § 1746, that the facts contained in the foregoing Verified Complaint are true and correct.

David T. Smorodin

June 23, 2017

Date